NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0751n.06
Filed: October 11, 2006

No. 05-5010

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | On Appeal from the United States |
| ANTONIO D. JONES, | ) | District Court for the Middle |
| | ) | District of Tennessee |
| Defendant-Appellant. | ) | |
| | ) | |

Before:    BOGGS, Chief Judge; COLE, Circuit Judge; and ROSEN, District Judge.[*]

PER CURIAM.  Following a jury trial in the United States District Court for the Middle District of Tennessee, defendant-appellant Antonio Jones was convicted of:  1) possession with intent to distribute 50 or more grams of crack and some amount of cocaine, in violation of 21 U.S.C. § 841(a)(1); 2) possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and 3) being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  The district court sentenced him to concurrent life sentences on counts 1 and 3 and  five years' imprisonment on count 2, to run consecutive to counts 1 and 3.  Jones challenges his convictions and sentence on a variety of grounds.  For the reasons below, we affirm Jones's convictions and sentence.

_____

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

**I**

On June 17, 2002, Detective John Donegan of the Metro Nashville Police Department Vice Division swore an affidavit for a search warrant to search for controlled substances and related evidence at 3288 Niagara Court in Nashville. In the affidavit, Donegan stated that a confidential informant ("C.I.") had informed him that the C.I. could purchase crack or powder cocaine from "Antonio." The C.I. said that Antonio would usually make deliveries near a particular location (Stewart's Ferry Pike and I-40), would make several deliveries each day, and would always carry a gun. The C.I. described vehicles that Antonio would drive during the deals. The C.I. stated that Antonio lived at 3288 Niagara Court, and that the C.I. had gone with a relative of Antonio to that address for a drug deal in the past, but that the C.I. could not go to that address for a deal without the relative.

Donegan further swore that electric utility records showed that Antonio Jones maintained electric service at 3288 Niagara, that periodic surveillance showed that several of the vehicles the C.I. had described were registered to Jones and were present at 3288 Niagara, and that Jones had been convicted of felony drug and weapon charges.

At the instruction of Donegan, the C.I. made a controlled, observed drug purchase from Jones at a market on June 5, 2002. Jones drove a gray Chevrolet Lumina that the C.I. had previously described as one of "Antonio's" delivery cars. The police lost Jones's trail after the deal.

The C.I. made a second controlled, observed drug purchase from Jones, at Stewart's Ferry Pike and I-40, on June 14, 2002. A surveillance officer informed Donegan that Jones left from 3288 Niagara before the deal, driving a blue Ford registered to Jones. After the deal with the C.I., Jones

was observed making what appeared to be another drug deal. Jones was then followed to 655 Joseph Avenue, where he parked the Ford next to the Lumina he had used during the first controlled purchase. Jones entered 655 Joseph and exited shortly thereafter with a male and a female and drove off in the blue Ford. Later that day the blue Ford was parked at 655 Joseph and the gray Lumina was gone.

Donegan further stated in the affidavit that based on his training and experience (seventeen years as a police officer, thirteen as a narcotics investigator), he had learned that drug dealers often keep money, transaction records, and other materials related to their drug dealing in secure locations such as residences, and that they often keep weapons in such locations for protection.

A Tennessee state court judge issued the search warrant for 3288 Niagara on June 17, 2002.

On June 19, 2002, Donegan swore a separate affidavit for a second search warrant, this one to search 655 Joseph Avenue. In that affidavit he reiterated the above account from his June 17, 2002 affidavit for the 6288 Niagara search warrant. He added that records showed that Tameka Johnson maintained electric service at 655 Joseph. He further added that on June 17, 2002, the C.I. arranged a third controlled, observed drug purchase from Jones. On that occasion, surveillance showed Jones and one of his vehicles at 655 Joseph. Jones told the C.I. to meet him (at the same location as the second controlled buy) in thirty minutes. Shortly after that conversation Jones and another male left 655 Joseph in the blue Ford. Jones drove to 3288 Niagara, dropped off the passenger, went inside for a brief time, then exited and drove to meet the C.I. for the buy. Later that day the blue Ford was observed at 655 Joseph; Jones thereafter drove off in it.

In the second affidavit, Donegan also stated that surveillance of 655 Joseph on June 18, 2002 showed "a large amount of foot traffic going in and out in very short periods of time. At one point your affiant counted 9 peopled [sic] exiting the apartment in less than a ten minute period of time." The foot traffic continued until midnight. Jones came and went several times in both the blue Ford and the gray Chevrolet Lumina, and at one point was observed with another male driving to a location to make what appeared to be a drug deal with a female. During the same period of surveillance a woman believed to be Tameka Johnson was seen entering and exiting the apartment, and was seen driving the blue Ford. The next day, June 19, 2002, Donegan checked 655 Joseph and observed that both the blue Ford and the gray Lumina were parked in front of that location during the early morning hours, "when it would be expected for Mr. Jones to be asleep." The second affidavit also contained the same language regarding Donegan's expertise and the likelihood of drug dealers keeping money, etc., in their houses as did the first affidavit.

A Tennessee state court judge issued the search warrant for 655 Joseph on June 19, 2002.

Having obtained the search warrants for 3288 Niagara and 655 Joseph, the Nashville Police arranged another–the fourth–controlled, observed drug purchase by the C.I. from Jones on June 19, 2002. Jones told the C.I. to meet him at a gas station. Jones left from 655 Joseph in the blue Ford, which was driven by a female. Jones sat in the front passenger seat; Jones and the female were accompanied by another male. Jones apparently engaged in a drug transaction with an individual in the same location immediately before making the deal with the C.I. The police stopped the vehicle about two or three miles from the scene of the deals. After the occupants got out of the vehicle, Jones was advised of his rights.

The police recovered $655 from Jones, including $250 in marked money from the controlled drug purchase that had just taken place. The police took all of the subjects–Tameka Johnson was the female–back to 655 Joseph to execute the search warrant for that address. There they found about 8.5 grams of cocaine, an electronic scale, and two boxes of sandwich baggies.

The police then took Jones and his companions to 3288 Niagara, and executed the search warrant for that address. The police found evidence that a child resided there. At 3288 Niagara, they also found over sixty grams of crack, about half a kilogram of cocaine, marijuana, approximately $11,000 in cash, a Luger 9-mm semiautomatic pistol, a Llama .380 semiautomatic pistol, a chrome-plated revolver, a Ruger .44-caliber Magnum revolver, an AK 47-type rifle, a shotgun, boxes of ammunition, a holster, a bullet-proof vest, electronic scales, baggies, what appeared to Donegan to be drug transaction ledgers, a bottle of Vitablend, commonly used as a cutting agent for cocaine (according to Donegan), photographs on display depicting Jones with other men and with Candace Shelton (some of which show Jones possessing firearms found during the search), women's clothing, men's clothing (some of which matched clothing worn by Jones in the photographs), and paperwork of Jones.

The crack, Ruger 9-mm pistol, Llama .380 pistol, Vitablend, drug transaction ledgers, electronic scales, and baggies were all found in a dresser in the master bedroom; the chrome-plated revolver and bullet-proof vest were found in a closet in the master bedroom; the Ruger .44 Magnum, which was loaded, was found under a couch cushion in the den; the shotgun was under a mattress in the master bedroom; the cocaine was in a safe along with cash, which was near the dresser; the marijuana was in the dresser, in the safe, and in a small refrigerator in the master bedroom.

Officer Jesse Burchwell testified that he read *Miranda* rights to Jones, using a printed form, after they arrived at 3288 Niagara. That was the second time Jones had been given *Miranda* warnings that day; the first had occurred at his arrest. Jones waived his rights in writing on the form. After waiving his *Miranda* rights, Jones said that he would cooperate with law enforcement, went into considerable detail regarding his cocaine supplier and the nature of his dealings with that supplier, stated that he cooked cocaine into crack to sell, told the police the location of several of the firearms seized, and said that he had the firearms for protection. In addition, he stated that he lived at 3288 Niagara, and that Candace Shelton, his girlfriend and the mother of one of his children, also lived at 3288 Niagara. He said that the police had found all of his drugs and money.

At one point during the execution of the search warrant at 3288 Niagara, Donegan asked Jones how much money was in the safe, "because there was a pretty good chunk there," and Jones responded that the amount was between eleven and twelve thousand dollars. Donegan recalled at trial that the actual amount totaled $11,015. Donegan also asked Jones about a large bag of white powder that did not smell like cocaine, which Jones stated consisted only of cut, not of cocaine.

Jones was tried before a jury in the United States District Court for the Middle District of Tennessee and found guilty on all three counts. Jones, through appellate counsel, raises the six arguments addressed in Section II. Jones raises six additional issues in a pro se brief, which are addressed in Section III.

**II**

**A. Probable cause for issuance of the search warrants**

Jones argued in a motion to suppress evidence that the search warrants for 3288 Niagara Court and 655 Joseph Avenue were unsupported by probable cause. After a hearing, the district court denied the motion. Jones reiterates his challenge on appeal.

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation omitted). We view the evidence "in a light most likely to support the decision of the district court." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).

This court has stated that "[i]n determining whether an affidavit establishes probable cause, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Carpenter*, 360 F.3d at 594 (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). "To justify a search," we continued, "the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *Carpenter*, 360 F.3d at 594 (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

We find that a substantial basis existed for the Tennessee state judge to conclude that probable cause existed. *See Carpenter*, 360 F.3d at 594 ("the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."). Donegan's affidavits showed a nexus between the two addresses and evidence of Jones's drug trafficking.

As reported in Donegan's affidavit regarding 3288 Niagara, a C.I. stated that a drug dealer named Antonio lived at 3288 Niagara and that the C.I. had purchased drugs from Antonio at that location. The C.I. described vehicles that Antonio used in his deals. The affidavit illustrated that the C.I.'s hearsay information was corroborated to a considerable degree by subsequent police investigation. *See Frazier*, 423 F.3d at 532 (" a court must consider the veracity, reliability, and the basis of knowledge for [hearsay information from a C.I.] as part of the totality of circumstances for evaluating the impact of that information."). Jones maintained electrical service at 3288 Niagara, periodic surveillance showed that several of the vehicles the C.I. had described were registered to Jones and were present at 3288 Niagara, and Jones had been convicted of felony drug and weapon charges.

Furthermore, and more importantly, the affidavit included details of two controlled drug buys between the C.I. and Jones that were arranged by the police, before at least one of which (on June 14, 2002) the police observed Jones leaving directly from 3288 Niagara, and during both of which the police noted that Jones drove a vehicle that was described by the C.I. and that they had seen parked at 3288 Niagara. That information, particularly in combination with Donegan's statements that in his experience it is often the case that drug dealers store contraband and other evidence in their residences or in locations that they control but that are titled in the name of others, clearly links Jones's drug dealing to the 3288 Niagara location, and creates more than a "fair probability" that evidence of such drug dealing would be found at 3288 Niagara.

Regarding the warrant for 655 Joseph, the affidavit for that address averred that Jones traveled to 655 Joseph after the second controlled drug buy. Surveillance showed both of the relevant cars at

655 Joseph at various times. Before the third controlled drug purchase, Jones left from 655 Joseph with another male and stopped briefly at 3288 Niagara before traveling to the location of the deal. Later that day Jones was again seen at 655 Joseph and drove away from it in the blue Ford. The day after the third observed drug deal, surveillance of 655 Joseph showed "a large amount of foot traffic going in and out in very short periods of time." The foot traffic continued until midnight. Jones came and went several times in both the blue Ford and the gray Chevrolet Lumina, and at one point was observed with another male driving to a location to make what appeared to be a drug deal with a female. The next day, both the blue Ford and the gray Lumina were parked in front of 655 Joseph during the early morning hours, "when it would be expected for Mr. Jones to be asleep." The affidavit for 655 Joseph also contained the language regarding Donegan's expertise and the likelihood of drug dealers keeping relevant evidence in their residences or in residences titled to others, but which the dealers actually controlled. Again, the information in the affidavit for 655 Joseph links Jones's drug dealing to the location, and creates a fair probability that evidence of that drug dealing would be found there.

## B. Voluntariness of Jones's statements

In his motion to suppress, Jones also contended that his statements following his arrest at 3288 Niagara should have been suppressed as the products of coercion, and because he did not voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

In assessing whether a defendant's statements were coerced, the test is whether, considering the totality of the circumstances, "the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994). At the

suppression hearing, Jones stated that his statements at 3288 Niagara were coerced because Officer

Burchwell smacked and kicked him. He also asserted that he was not read his *Miranda* rights, and

that he was tricked into signing the waiver of his *Miranda* rights, which he says he signed the day

after his arrest and the searches, because Officer Burchwell told him that he would not "be charged

with what I was helping him do," apparently referring to his subsequent cooperation with the police

in their investigation of his suppliers. Officer Burchwell flatly denied any physical abuse, and denied

telling Jones that he would not be charged. The district court found that Jones was not a credible

witness and ruled that his statements were voluntary. We "give great deference to the district court's

credibility determinations as it is in the best position to observe witnesses." *United States v. Johnson*,

344 F.3d 562, 567 (6th Cir. 2003). On these facts we disturb neither the district court's credibility

determination nor its conclusion that Jones's statements were uncoerced.

The government bears the burden of proving, by a preponderance of the evidence, that the

defendant's waiver of his *Miranda* rights was knowing and voluntary. The test for knowing and

voluntary waiver of *Miranda* rights is essentially the same as that for whether statements were

coerced. *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003) (citing *Colorado v. Connelly*,

479 U.S. 157, 168-70 (1986)). Jones initialed and signed a waiver of his *Miranda* rights dated June

19, 2002, the date of the arrest and searches, thus contradicting his account that he signed it the day

after his arrest. Officer Burchwell testified at the suppression hearing that he read the *Miranda* waiver

to Jones at 3288 Niagara, that Jones understood the rights and signed the waiver, and that he

(Burchwell) used neither physical nor psychological threats to coerce Jones. The district court ruled

that Jones's statements were made after a knowing and voluntary waiver of his rights. There is no reason to reverse that ruling.

### C. Sentencing enhancements for prior convictions

#### 1. Statutory sentencing enhancement pursuant to 21 U.S.C. § 841(b)(1)(A)

21 U.S.C. § 841(b)(1)(A) provides that one who, *inter alia*, possesses with intent to distribute 50 grams or more of crack, "after two or more prior convictions for a felony drug offense have become final, . . . shall be sentenced to a mandatory term of life imprisonment without release . . . ." Before trial, the government filed an information pursuant to 21 U.S.C. § 851 alleging that Jones had previously been convicted of multiple felony drug offenses in Tennessee state court, and faced a mandatory life sentence on count 1 (the charge of possession with intent to distribute over 50 grams of crack and some amount of cocaine). The jury specifically found that Jones had possessed with intent to distribute 50 grams or more of crack. Jones was sentenced to the mandatory minimum of life imprisonment on count 1 pursuant to 21 U.S.C. § 841(b)(1)(A).

Jones argued unsuccessfully before the district court, and asserts on appeal, that he did not have two prior convictions for a felony drug offense because his "two prior convictions are actually the same course of conduct and should only be treated as one conviction for sentencing purposes."

We assume, without deciding, that we review the district court's decision to count Jones's prior convictions as separate predicate offenses for purposes of 21 U.S.C. § 841(b)(1)(A) under a de novo standard rather than for clear error. *See United States v. Thomas*, 211 F.3d 316, 319 (6th Cir. 2000) ("Since determining whether the conduct was a single occasion or multiple occasions" under the analogous Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), "presents a legal question

concerning the interpretation of a statute, we review the district court's decision de novo."); *United States v. Gray*, 152 F.3d 816, 820 (8th Cir. 1998) (resolution of defendant's argument that his prior felony drug convictions may only be counted as one under the 21 U.S.C. § 841(b)(1)(A) requires interpretation of the statute and is thus reviewed de novo); *United States v. Pugh*, No. 96-3954, 1998 WL 165143 at *5 (6th Cir. Mar. 31, 1998) (reviewing de novo the mixed question of law and fact of whether the defendant's prior convictions were "final" under 21 U.S.C. § 841(b)(1)(A)). But *see United States v. Powell*, 404 F.3d 678, 682 (2d Cir. 2005) (addressing de novo the question of law of "what, as a matter of statutory construction, constitutes a separate conviction," under 21 U.S.C. § 841(b)(1)(A), and then, applying the standard to the district court's decision, reviewing for clear error). Regardless of which standard of review we employ, the result of Jones's challenge is the same.

This circuit has adopted the "separate criminal episodes" test for determining whether a defendant's prior felony drug convictions qualify as discrete predicate convictions to enhance the sentence pursuant to 21 U.S.C. § 841(b)(1)(A). Under that test, prior felony drug convictions amount to separate predicate convictions for the purposes of sentence enhancement when they arise from "separate criminal episode[s]" that are "distinct in time." "An episode is an incident that is part of a series, but forms a separate unit within the whole. Although related to the entire course of events, an episode is a punctuated occurrence with a limited duration." *United States v. Hughes*, 924 F.2d 1354, 1361-62 (6th Cir. 1991).

In *United States v. Goins*, 53 F. App'x 724, 729-30 (6th Cir. 2002), we held that two prior felony convictions for drug sales that took place six weeks apart, even though they involved the same

government informant and the defendant was convicted of both felonies on the same day, amounted to separate episodes and could be used as two predicate convictions for a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A). This court has noted that the fact that a defendant received concurrent sentences for prior felony drug convictions "does not mean that the convictions were part of the same episode." *United States v. Anderson*, 76 F.3d 685, 691 (6th Cir. 1996).

Other circuits applying the "separate episodes" test have held that prior convictions for three drug offenses committed within minutes of each other were distinct, and countable as separate predicate offenses for a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), when they involved sales to different individuals and each was a complete transaction in itself. *See United States v. Green*, 293 F.3d 886, 894-95 (5th Cir. 2002). Similarly, prior convictions for two felony offenses for drug sales to the same informant occurring one day apart, of which the defendant was convicted in the same trial and for which he received concurrent sentences, amounted to separate episodes. *Gray*, 152 F.3d at 821-22.

In this case, the government gave notice of three prior Tennessee state felony drug convictions (only two of which are needed) as predicate offenses for a mandatory minimum life sentence. Following a plea deal, Jones was convicted on October 22, 2000 of the following drug crimes: selling 26 grams or more of cocaine, offense date February 15, 2000; possession with intent to deliver/sell less than .5 grams of cocaine, offense date February 19, 2000[1]; and selling 26 grams or more of

---

[1]The judgment in the Tennessee state court refers to Jones's conviction for the crime of "Poss of [illegible] .5g coc." As the discussion at subsection III.E, *infra*, demonstrates, that language was almost certainly shorthand for the felony offense of possession with intent to deliver/sell less than .5 grams of cocaine.

cocaine, offense date February 24, 2000. The convictions for offenses committed on February 15 and 24, 2000, appear to stem from controlled, recorded transactions involving one confidential informant.

The three convictions arose from separate episodes, and thus each can be used as one of the two predicate drug felonies necessary to enhance Jones's sentence on his federal drug charge to a mandatory life sentence. The prior drug crimes occurred on separate dates–February 15, 19, and 24, 2000. Although the time between any two of those crimes was not as great as the six weeks in *Goins*, Jones's previous drug crimes are much further apart in time than the transactions in *Green* (three sales to different buyers within minutes of each other) and *Gray* (two sales, one day apart, to the same informant). That judgment was entered against Jones on the same day by the same court and, apparently, with concurrent sentences, does not thereby make the three crimes part of the same episode. *See Anderson*, 76 F.3d at 691; *Gray*, 152 F.3d at 820-22 (prior convictions for two felony offenses for drug sales of which the defendant was convicted in the same trial and for which he received concurrent sentences amounted to separate episodes). Each of the three previous state drug felonies (and only two are needed) listed by the government constitute a separate episode, and thus qualify as predicate offenses for the purposes of enhancing Jones's sentence for possession of over fifty grams of crack to mandatory life imprisonment.

Jones argues that whether the prior felony drug convictions are distinct for the purposes of determining his statutory minimum sentence should be decided on the basis of various Sentencing Guideline provisions regarding the relatedness of crimes. But this inquiry is not one based on the Guidelines; it is based on 21 U.S.C. § 841(b)(1)(A), and has its own set of precedents. *See, e.g., Hughes*, 924 F.2d at 1361-62; *United States v. Winston*, 37 F.3d 235, 240-42 (6th Cir. 1994); *United*

*States v. French*, 974 F.2d 687, 697-99 (6th Cir. 1992); *Pugh*, 1998 WL 165143, at *5. *See also United States v. Cannon*, 429 F.3d 1158, 1160 (7th Cir. 2005).

### 2. Sentencing enhancements under the Guidelines

Jones also challenges "being a career offender and armed career offender," presumably under the Guidelines, on the grounds that his "prior convictions were the same course of conduct and should be treated as one conviction." This argument is irrelevant, as Jones received a statutory mandatory minimum sentence of life imprisonment on count 1.

### D.  Eighth Amendment challenge to mandatory life imprisonment

Jones argues that his enhanced mandatory minimum sentence of life imprisonment, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851, violates the Eighth Amendment's prohibition on cruel and unusual punishment. He claims that 21 U.S.C. § 841(b)(1)(A) is "grossly disproportionate" because "it does not distinguish between defendants who have felony convictions for drug possession only, and those defendants who have more serious drug trafficking felonies." We note that in this case at least two of Jones's prior Tennessee state court convictions were for selling drugs–not for mere possession.

The Supreme Court upheld against an Eighth Amendment challenge the mandatory sentencing, under Michigan statute, to life imprisonment of a first-time felon who was convicted for possessing 672 grams of cocaine. *Harmelin v. Michigan*, 501 U.S. 957, 961, 994, 1002  (1991).  A plurality of the *Harmelin* Court stated that "the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle" that applies to noncapital sentences.  501 U.S. at 997 (Kennedy,

J., concurring). It held that the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id*. at 1001. The *Harmelin* Court added that "[w]e have never invalidated a penalty mandated by a legislature based only on the length of sentence, and, especially with a crime as severe as this one, we should do so only in the most extreme circumstances." *Id*. at 1006-07.

This court has followed the *Harmelin* plurality's narrow proportionality principle. *United States v. Hill*, 30 F.3d 48, 50-51 (6th Cir. 1994). In *Hill*, we upheld against an Eighth Amendment challenge the imposition of a mandatory life sentence, pursuant to 21 U.S.C. § 841(b)(1)(A), on a third-time felon convicted of conspiracy to distribute 177.8 grams of crack. We have subsequently interpreted *Hill* as "h[o]ld[ing] that a mandatory term of life imprisonment without release upon a third felony drug conviction did not violate the Eighth Amendment's prohibition against cruel and unusual punishment." *United States v. Flowal*, 163 F.3d 956, 963-64 (6th Cir. 1998). In *United States v. Goode*, No. 97-2163, 1999 WL 520553, at *4 (6th Cir. July 14, 1999), a case directly on point, we found that, under *Harmelin* and *Hill*, a mandatory life sentence imposed on a third-time drug felon convicted of conspiring to distribute and possession with intent to distribute over 50 grams of crack did not violate the Eighth Amendment.

In this case, Jones was convicted of possession with intent to distribute over 50 grams of crack. (Police also found about a half a kilogram of cocaine and some quantity of marijuana at 3288 Niagara.) Under the above-cited precedents, it is clear that Jones's sentence does not violate the Eighth Amendment.

## E. Denial of downward departure

Jones argues that the district court erred in denying his motion for downward departure. Jones moved for downward departure under the Sentencing Guidelines because of allegedly harsh incarceration in the Robertson County Jail and because, he asserts, his "criminal history calculation overstates the seriousness of his criminal history." At the sentencing hearing, the district court heard evidence related to the motion for downward departure, including testimony from Jones regarding his confinement at the county jail. The district court denied the motion.

We have held that *United States v. Booker*, 543 U.S. 220 (2005), did not affect our well-established rule that we "shall not review decisions of a district court not to depart downward unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Puckett*, 422 F.3d 340, 344-46 (6th Cir. 2005) (internal quotation marks and citation omitted). We added that "the district court need not 'explicitly state that it is aware of its discretionary authority to depart downward.'" 422 F.3d at 346 (citing *United States v. Lucas*, 357 F.3d 599, 609-10 (6th Cir. 2004)).[2]

Nothing suggests that the district court was unaware of or did not understand its discretion to make a downward departure under the Guidelines. Indeed, the fact that it heard evidence on, e.g., the conditions of Jones's imprisonment at the county jail suggests that it did understand its discretion.

---

[2]In *United States v. McBride*, 434 F.3d 470, 474-77 (6th Cir. 2006), this court stated that "*Puckett* simply precludes our review of that narrow determination of a denial of a Chapter 5 Guideline departure within the context of the Guideline calculation. It does not prevent our review of a defendant's claim that his sentence is excessive based on the district court's unreasonable analysis of the section 3553(a) factors."

Furthermore, Jones received the statutory minimum sentence on counts 1 and 2. Under 18 U.S.C. § 3553(e), the district court may depart below the statutory minimum if the government files a motion requesting it, but the government did not file such a motion in this case. Accordingly, the motion for downward departure applies only to count 3, and is not subject to review even then.

### F. Whether remand is required under *Booker*

Jones argues that he is entitled to a remand for resentencing under *Booker* because the Sentencing Guidelines–he points in particular to U.S.S.G. § 5G1.1(c)(2)–are advisory after *Booker*.[3]

We have held that when the defendant has been sentenced to the statutory mandatory minimum, *Booker* is not implicated. *United States v. Smith*, 419 F.3d 521, 531-32 (6th Cir. 2005); *United States v. Smith*, No. 05-3422, 2006 WL 1133574, at *2 (6th Cir. Apr. 27, 2006); *United States v. Johnson*, 129 F. App'x 966, 971-72 (6th Cir. 2005) (collecting cases from other circuits). Jones was sentenced on count 1 to mandatory life imprisonment, based on the combination of 1) the jury's finding that he had possessed with intent to distribute more than 50 grams of crack and 2) his two prior convictions. As discussed above, the district court properly found under this court's separate episodes test that Jones had at least two predicate drug felonies. Jones was sentenced on count 2 to five years, also the statutory minimum.

---

[3]Section 5G1.1 deals generally with sentencing on a single count of conviction when the statutory maximum is lower than the bottom of the Guidelines range or when the statutory minimum is higher than the top of the Guidelines range; subsection (c) states that "[i]n any other case, the sentence may be imposed at any point within the applicable guideline range, provided that the sentence – (1) is not greater than the statutorily authorized maximum sentence, and (2) is not less than any statutorily required minimum sentence."

That leaves count 3, the felon-in-possession-of-firearms count. The statutorily mandated term for that count, after taking into account Jones's prior convictions, was 15 years to life. The district court sentenced Jones to a life term on that count, to run concurrently with count 1, possibly after grouping it with count 1 pursuant to the Guidelines.

We have declined to remand for resentencing pursuant to *Booker* an appeal from a sentence imposed for one count when the defendant received a longer or equal statutory mandatory minimum term on another count and the two run concurrently. *United States v. Cornell*, 162 F. App'x 404, 409-10 and n.1 (6th Cir. 2006); *United States v. Grundy*, No. 03-6435, 2006 WL 1133321, at *2 (6th Cir. Apr. 27, 2006); *United States v. Goliday*, 145 F. App'x 502, 507 (6th Cir. 2005).

Because the life sentence on count 1 was statutorily required, we do not remand for resentencing under an advisory Guidelines system.

## III

### A. Confrontation Clause Challenges

In his pro se supplemental brief, Jones argues that the district court violated his Sixth Amendment Confrontation Clause rights when it admitted: 1) testimony by Det. Donegan regarding information that the C.I. had provided to Donegan; and 2) recordings of the controlled drug buys between Jones and the C.I. We address each in turn.

### 1. Information provided by the C.I. to Donegan

During direct examination of Donegan by the Assistant U.S. Attorney, the following exchange ensued:

Q. How did you come to being interested in Mr. Jones?

A. I was contacted by a concerned citizen here in Davidson County who stated that he had been --

MR. COOPER [Jones's trial attorney]: Your Honor, I'm going to object to the hearsay.

THE COURT: Well, if it's not offered for the truth of the matter asserted. In other words, members of the jury, someone can receive some information not knowing whether it is true or not, can later testify about receiving that information, and you're not to consider that information as necessarily being true or untrue, because it's not sworn to, but he can testify as to what he was told and what he did upon receiving that information. Go ahead.

BY MR. KOSHY [the AUSA]:

Q. If you would, just keep it in a very summary fashion what this person told you. For instance, did he tell you that Mr. Jones–that he could perhaps purchase controlled substances from Mr. Jones?

A. Yes, that a person that he knew by Tony, and also knew his full name of Antonio Jones, that he could purchase cocaine from that person, gave me the address of 3288 Niagara Court as being his residence and two other locations where he would meet the informant, or the concerned citizen at that time, to make the deliveries of cocaine, one of those being on Stewarts Ferry near I-40 and the other one being closer downtown off North 1st.

The questioning then turned to the steps Donegan took to investigate Jones.

Jones argues that the admission of that evidence violates his Confrontation Clause rights. He did not raise a Confrontation Clause objection to the admission of the evidence at trial.[4] "Because Defendant raised only a hearsay objection to these statements at trial, and did not challenge their admissibility on constitutional grounds, our review is governed by the plain error standard." *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005).

"Pursuant to plain error review, an appellate court may only correct an error not raised at trial if there is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Cromer*,

---

[4]The trial predated the Supreme Court's opinion in *Crawford v. Washington*, 541 U.S. 36 (2004).

389 F.3d 662, 672 (6th Cir. 2004) (internal quotation marks and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Ibid.* (internal quotation marks and citation omitted).

In *Crawford*, the Supreme Court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. The Court noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59 n.9.

In *Cromer*, we declared that "[t]he proper inquiry" for whether a statement is testimonial is "whether the declarant intends to bear testimony against the accused." "That intent, in turn," we continued, "may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." 389 F.3d at 672, 675. The *Cromer* court held that statements by a C.I. to police are testimonial. *Id*. at 675. It commented:

> Tips provided by confidential informants are knowingly and purposely made to authorities, accuse someone of a crime, and often are used against the accused at trial. The very fact that the informant is confidential–*i.e.*, that not even his identity is disclosed to the defendant–heightens the dangers involved in allowing a declarant to bear testimony without confrontation. The allowance of anonymous accusations of crime without any opportunity for cross-examination would make a mockery of the Confrontation Clause.

*Ibid*.

The *Cromer* court then addressed whether in that case parts of the lead police investigator's trial testimony that disclosed information provided to her by a C.I. violated the defendant's Confrontation Clause rights. 389 F.3d at 675-79.[5] The *Cromer* court divided the relevant parts of the police officer's testimony into three sections for purposes of its analysis. *Id*. at 675-79.

In the first section, the officer was asked on direct examination what her role was in investigating the defendant. She responded that she had received information about a particular address, and that she began investigating the address in connection with drug activity, as a result of which she came up with enough information for a search warrant. *Cromer*, 389 F.3d at 675. The *Cromer* court noted that that aspect of the officer's testimony did not violate the Confrontation Clause because it arguably did not put any statements from the C.I. before the jury, and even if it did, the testimony "was provided merely by way of background." The court stated that the Confrontation Clause does not bar assertions offered not for the truth of their content but rather to explain why the government commenced the investigation.

By contrast, the *Cromer* court held that the second section of the officer's testimony that revealed statements by the C.I. did amount to a Confrontation Clause violation. Also on direct examination, the officer was asked the names of the people the police believed, prior to executing the search of the residence in question, to be associated with the illegal activities at that address. She responded by saying that one was "a person nicknamed Nut, which is Mr. Sean Cromer." 389 F.3d at 676. The *Cromer* court stated that "[t]his testimony was not offered merely to explain why a

---

[5]Cromer was convicted by jury of possessing cocaine with intent to distribute. *Id*. at 665.

government investigation was undertaken or to demonstrate the effect of the out-of-court statements on the officers," but that "the purpose of this testimony could only have been to help establish that the person nicknamed 'Nut' . . . , which the prosecution demonstrated elsewhere in the trial was Sean Cromer's nickname, had been involved with the illegal drug activity occurring at the . . . residence." *Id*. at 676.

The *Cromer* court found the first and second sections of the police officer's testimony–based on statements by the C.I.–distinguishable on the following grounds: the second implicated Cromer in a way that went to the heart of the prosecution's case; the first only alluded in the vaguest possible terms to the C.I.'s statements and linked those statements with actions taken by the officer; the first briefly explained why the government began the investigation of the residence and "at least arguably provided some assistance in understanding the background of the case." The court noted that the second section informed the jury that the C.I. had implicated "Nut" in illegal activities, and stated that any attempt to link that to subsequent police activities was a "sham"; the central legal issue in the case was not whether illegal activity took place at the residence but rather whether Cromer knowingly participated in it.

As such, the court found that "evidence that the government focused its investigation on Nut is helpful to the jury only insofar as it relates to the difficult question whether Cromer was involved in the illegal activity," and concluded that "the purpose of this testimony was to establish the truth of the matter asserted: to prove that Cromer was, indeed, involved in the illegal activity, as stated by the CI." *Id*. at 676-77. For similar reasons, the court found that the third category of objectionable

testimony, the officer's testimony on redirect regarding a physical description of Cromer provided by the CI, also violated the Confrontation Clause. *Id*. at 678.

The *Cromer* court found that the error was plain under *Crawford*, and that Cromer's substantial rights were violated because, in light of the closeness of the facts of that case, "the admission of statements directly tying Cromer to the crime likely impacted the outcome of the trial." Accordingly, the court reversed Cromer's conviction. *Id*. at 679.

*Cromer* makes clear that statements made by a C.I. to the police can be "testimonial." The question, in that case as well as in this one, then becomes whether the trial testimony of the police officer that refers to statements made to the officer by a non-testifying C.I. is offered to provide 1) background information regarding the investigation and why the police acted as they did, or 2) to prove the truth of the matter asserted. In this case, Donegan's testimony regarding what the C.I. told him about Jones provided information to the jury about why Donegan investigated Jones, and that testimony was tied to subsequent actions taken by the police. Furthermore, it could be argued that the district court's intervention and instruction mitigated the effect of the C.I.'s statements.

On the other hand, Donegan's testimony repeating the C.I.'s statements squarely implicated Jones as residing at 3288 Niagara, and tied Jones to drug activities based at that address. While there are no explicit indications that the prosecutor elicited the testimony for the purpose of using the evidence for the substance of the matter asserted, the form of the prosecutor's question virtually ensured that Donegan's response would be inculpatory on one or all of the central legal issues in the case. Furthermore, a review of the trial transcript shows no arguments or confusion over why the police investigated Jones. Under *Cromer*, it seems that the admission of Donegan's testimony

regarding testimonial statements made by the C.I. were in fact offered for the truth of the matter asserted, rather than to serve "the purpose of explaining how certain events came to pass or why the officers took the actions they did," 389 F.3d at 676, and that the district court committed plain error in admitting it.

The error did not affect Jones's substantial rights, however. "An error affects substantial rights when the error was prejudicial, that is, when it 'affected the outcome of the district court proceedings.'" *United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The government presented proof of four controlled drug buys; in 655 Joseph the police found drugs and a scale; in 3288 Niagara they found large amounts of drugs, firearms, photos of the defendant with firearms, photos of the defendant wearing clothing found at that residence, and paperwork of Jones's; Jones admitted to living at 3288 Niagara and gave the police information regarding his drug supplier and the location of some of the firearms in the house, which he said he kept for protection. Under these circumstances, Jones cannot show that the admission of the one brief part of Donegan's testimony in which Donegan repeated statements from the C.I. affected the outcome of his trial.

### 2. Recordings of the controlled drug buys

The government sought to play at trial recordings of the controlled drug buys between Jones and the C.I. Jones objected on the basis of hearsay and lack of foundation. Following additional foundation testimony, the district court overruled the objection, although the recordings were not admitted into evidence until later, when Jones reasserted his lack-of-foundation objection and also

objected under Federal Rule of Evidence 404(b), the rule generally prohibiting evidence of prior bad acts. The jury asked to and did listen to one of the recordings during deliberations, apparently to hear a sample of Jones's voice.

Jones challenges the admission of the recordings as a violation of his Confrontation Clause rights. Again, because he did not raise that specific objection below, the challenge is reviewed for plain error.

Jones's challenge is unavailing. In *United States v. Sexton*, 119 F. App'x 735, 741-43 (6th Cir. 2005), we held that the admission of recordings involving a C.I. and a defendant did not violate the Confrontation Clause because the portions not involving the C.I. were party admissions and the portions involving the C.I. were offered not for the truth of the matters asserted but to "give meaning to the admissible responses of [the defendants]." The Third Circuit has come to the same conclusion via similar reasoning in *United States v. Hendricks*, 395 F.3d 173, 182-84 (3d Cir. 2005) adding that the portions of the recordings containing the defendant's and co-conspirator's statements were not testimonial and fell outside of *Crawford* for that reason.). The Third Circuit held that "if a Defendant or his or her coconspirator makes statements as part of a reciprocal and integrated conversation with a government informant who later becomes unavailable for trial, the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant or coconspirator's nontestimonial statements into context." *Ibid*.

Jones's statements captured on the recordings are party admissions and nontestimonial and do not violate the Confrontation Clause. Although the prosecutor did not state exactly why he had moved for the admission of the recordings, nor did the district court state why it overruled Jones's

objections, it is clear that the portions of the recordings capturing the C.I.'s statements were not offered for the truth of the matters asserted but rather, as in *Sexton* and *Hendricks*, to give meaning to Jones's statements by placing them in context. That is bolstered by the fact that the district court overruled Jones's hearsay objection.

Even if the portions of the recordings containing the C.I.'s statements were offered for the truth of what the C.I. said on them, however, and the admission of them violated the Confrontation Clause, the admission did not substantially affect Jones's rights, for the reasons discussed above. That the jury asked to hear a sample of Jones's voice from the tapes, and evidently did hear some part of the tapes (the record does not specify what they heard), does not alter that conclusion.

## B. Prosecutorial misconduct

Jones alleges in his pro se supplemental brief that the prosecutor committed misconduct by threatening Candace Shelton. Jones asserts that the prosecutor, in the courtroom while the jury was excused, told Shelton that she would receive a life sentence if she testified on behalf of the defense, and that the prosecutor had earlier "instructed Ms. Shelton to recant her suppression hearing statements and in return would grant her immunity." Jones attached to his pro se supplemental brief an affidavit from Shelton essentially conveying those and similar allegations.

Neither Jones's allegation of prosecutorial misconduct nor the information in Shelton's affidavit on which that allegation is based were presented to the district court. We will not consider Jones's allegations of prosecutorial misconduct, which were not raised or ruled upon below and are not sufficiently developed on appeal. *See PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 258 (6th Cir. 2003); *United States v. Cinnamon*, 112 F. App'x 415, 419 n.4 (6th Cir. 2004) (per

curiam).  Jones has presented no circumstances that would justify our considering the allegations.

*See United States v. Lane*, 909 F.2d 895, 900 (6th Cir. 1990) (internal quotation marks omitted).

### C. Admission of evidence of the prior controlled drug sales by Jones to the C.I.

In his pro se supplemental brief, Jones argues that the district court erred in admitting evidence

of the controlled drug sales between Jones and the C.I. that took place on June 5, 14, and 17,  2002.

He asserts that the evidence violated Federal Rule of Evidence 404(b) and that the district court

abused its discretion in admitting the evidence.

Rule 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show action in conformity therewith.  It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident."

Although the drug sales between Jones and the C.I. on June 5, 14, and 17, 2002, were not

charged as substantive counts in the indictment, the government introduced evidence of those drug

sales at trial, including testimony by Donegan and the recordings of the transactions.  Jones objected

at trial on multiple occasions on 404(b) grounds to the admission of that evidence.  The prosecutor

stated that the evidence of the drug sales from Jones to the C.I. prior to Jones's arrest was introduced

not for the reason prohibited by 404(b) but as evidence related to count 2, possession of firearms in

furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).  The prosecutor asserted

that Jones possessed the firearms in furtherance of the following drug trafficking crimes[6]:  1)

_____

[6]The indictment did not specify the drug trafficking crime underlying count 2.  It stated that
Jones's alleged possession of firearms in furtherance of that drug trafficking crime occurred "[i]n

possession with intent to distribute, as charged in count 1; 2) conspiracy with his supplier, Fernando Gonzales, to obtain and distribute cocaine; and 3) maintaining 3288 Niagara as a drug house, in violation of 21 U.S.C. § 856. The prosecutor claimed that the evidence of the drug sales on June 5, 14, and 17, 2002, was introduced to serve as evidence of those predicate drug trafficking crimes. The district court admitted the evidence on that ground.[7]

In discussing count 2 during his closing argument, the prosecutor stated that among the drug trafficking crimes Jones committed in furtherance of which he possessed firearms were possession with intent to distribute crack and cocaine on the day he was arrested, maintaining a drug house, and a drug-trafficking conspiracy with Fernando. In the district court's instructions to the jury, the court stated: "Count 1 alleges drug trafficking on or about June 19, 2002. There has been testimony about drug trafficking prior to June 19. That evidence was admitted as pertinent to the charge in Count 2 of the Indictment that I have just explained to you."

The district court did not abuse its discretion in admitting the evidence of the controlled drug transaction as evidence of the government's case on count 2, and in instructing the jury that it was to consider the evidence for that purpose. *See United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005) (finding no abuse of discretion in the district court's admission of testimony by a witness recounting prior drug dealing by the defendant where the defendant was charged with, *inter alia*,

---

or around June 2002."

[7]The prosecutor also argued that the evidence would be used with respect to count 1 to establish the motive, opportunity, and intent to distribute the crack and cocaine.

possession of marijuana with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime, and where the testimony served as evidence with respect to the firearm charge).

In *United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986), this court stated that "[w]hen other crimes allegedly committed by the defendant are introduced for a purpose other than those explicitly listed in Rule 404(b), the evidence must nonetheless be subjected to Rule 404(b) inquiry in order to ensure that it is not used to show that, on the occasion in question, the accused 'acted in conformity therewith,' or to show the defendant's bad character or criminal propensity."

The evidence of the prior drug sales from Jones to the C.I. passes this court's tripartite test for determining admissibility of prior acts evidence under 404(b). *See United States v. Haywood*, 280 F.3d 715, 719-20 (6th Cir. 2002) (setting out the tripartite test). First, the district court did not abuse its discretion in implicitly deciding that the evidence of the prior acts–the controlled drug transactions–was sufficient to show that those prior acts actually occurred. *United States v. Matthews*, 440 F.3d 818, 828-29 (6th Cir. 2006); *Haywood*, 280 F.3d at 720. Second, the district court properly found, as discussed above, that the evidence of the other acts was probative of an issue other than character. Third, the district court did not abuse its discretion in deciding that the probative value of the evidence was substantially outweighed by its potential prejudicial effect. *See Haywood*, 280 F.3d at 723 (district court may implicitly make that determination by admitting the evidence). While the evidence of Jones's prior drug dealing may have had a prejudicial impact on the jury with respect to count 1, there was considerable other evidence on the issue, and the district court's limiting instruction to the jury mitigated any such prejudice.

Finally, even if the admission of the evidence was erroneous under 404(b), it is subject to harmless error analysis, and in this case any error was harmless in light of the other overwhelming evidence of the defendant's guilt on the three counts. *United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001).

### D. Claims related to 18 U.S.C. § 3559(c)(1)

In his pro se supplemental brief, Jones makes several arguments related to 18 U.S.C. § 3559(c)(1). Jones was not prosecuted under 18 U.S.C. § 3559(c)(1), and that statutory provision is not otherwise relevant to this case. *See, e.g.*, *Goins*, 53 F. App'x at 730 (refusing to import the requirements of § 3559(c)(1) into § 841(b)(1)(A)).

### E. Characterization of Jones's previous state conviction for possessing .5 grams or less of cocaine as a felony

Jones argues in his pro se supplemental brief that his prior Tennessee state conviction for possessing less than .5 grams of cocaine did not count as a "felony" for the purposes of 21 U.S.C. § 841(b), and thus could not be used as one of the predicate offenses triggering his mandatory life sentence under § 841(b)(1)(A).

First, this challenge is futile. As discussed *supra* part II, subsection C.1., 21 U.S.C. § 841(b)(1)(A) requires only two prior felony drug convictions to trigger a mandatory life sentence, and Jones's other two prior Tennessee state felony drug convictions, both for selling 26 grams or more of cocaine, amount to separate episodes and thus on their own can fulfil the predicate offense requirement.

Second, the argument is waived. At the sentencing hearing, Jones's counsel acknowledged that the prior conviction of which Jones complains here was a felony.

Third, the argument is almost certainly incorrect. 21 U.S.C. § 802(44) defines "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State . . . that prohibits or restricts conduct relating to narcotic drugs . . . ." On October 19, 2000, Jones pleaded guilty in Tennessee state court to (in his handwriting) "poss. of less than 1/2 G of cocaine" in case number 2000 I 943. The Tennessee state court judgment, dated October 22, 2000, noted that Jones was convicted of "Poss of [illegible] .5g coc" under Tenn. Code Ann. § 39-17-417. The judgment stated that the crime involved a schedule II drug and constituted a class C felony. On that count Jones was sentenced to six years in a workhouse and a $2,000 fine. The pre-sentence investigation report in this case denoted that state conviction as "Possession with Intent to Sell Less Than .5 Gm of Cocaine." Section 39-17-417 prohibits, *inter alia*, possessing a controlled substance with intent to deliver or sell it; it does not prohibit simple possession. Section 39-17-417(a)(4). Under Section 39-17-417(c)(2)(A), possessing with intent to deliver/sell less than .5 grams of cocaine, a Schedule II drug, is a Class C felony. We see nothing in the Tennessee Code that indicates that a Class C felony is not punishable by more than a year of imprisonment, and Jones was in fact sentenced to six years' imprisonment. *See* Tenn. Code Ann. §§ 40-35-101, 40-35-111, 40-35-112.

Thus it appears that Jones was actually convicted in Tennessee of possessing with intent to deliver/sell less than .5 grams of cocaine under Section 39-17-417, and that the references in the state court documents to possession of .5 grams or less of cocaine were shorthand. The offense is properly

a felony drug offense. Jones's prior conviction could be used as a predicate conviction for sentencing enhancement pursuant to 21 U.S.C. § 841(b)(1)(A).

**F. Sufficiency of the evidence regarding count 2, possession of firearms in furtherance of a drug trafficking crime**

In his pro se supplemental brief, Jones argues that his conviction for possessing a firearm in furtherance of a drug trafficking crime was not supported by sufficient evidence.

"We must uphold a jury verdict if viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Blood*, 435 F.3d 612, 618 (6th Cir. 2006) (internal quotation marks and citations omitted). Additionally, it appears that Jones did not move for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 during trial or no later than seven days after the verdict, and thus we review the claim for miscarriage of justice, which exists "only if the record is devoid of evidence pointing to guilt." *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005). *See also United States v. Davis*, 430 F.3d 345, 359 (6th Cir. 2005).

Sufficient evidence exists that Jones constructively possessed the firearms found at 3288 Niagara and that there was a specific nexus between the firearms and the drug trafficking offense of possession with intent to distribute the crack (although the nexus could also be maintaining a drug house or conspiring with his supplier, Fernando). *See Frederick*, 406 F.3d at 763-65; *United States v. Mackey*, 265 F.3d 457, 460-63 (6th Cir. 2001).

Sufficient evidence supports Jones's constructive possession of the guns. Jones "knowingly ha[d] both the power and the intention at any given time to exercise dominion and control" over the

firearms. *Frederick*, 406 F.3d at 765 (internal quotation marks and citation omitted). The guns and drugs were found in close proximity in the 3288 Niagara residence; the guns were located in places clearly chosen to make them easily accessible; Jones admitted he resided at 3288 Niagara and that the guns were his. Several recent circuit court decisions have found that sufficient evidence established constructive possession of guns in furtherance of a drug trafficking crime in analogous factual circumstances. *See, e.g., United States v. McLee*, 436 F.3d 751, 757-58 (7th Cir. 2006); *United States v. Brooks*, 438 F.3d 1231, 1234, 1237-38 (10th Cir. 2006); *United States v. Smith*, No. 05-2379, 2006 WL 535756, at ** 1-5 (11th Cir. Mar. 6, 2006).

The evidence is clear that the firearms bore a specific nexus to Jones's possession of the drugs with intent to distribute them. In the master bedroom of 3288 Niagara, two pistols, the crack, cut, transaction ledgers, scales, and baggies were all found in a dresser; near the dresser was a safe containing cash and cocaine; under the mattress was a shotgun. Further afield, a loaded .44 magnum was found under a couch cushion in the den. Jones admitted to residing at 3288 Niagara and to possessing the guns, he pointed out the location of some of the guns during the search, he said that he had the guns for protection, and he went into detail regarding his drug operations and supplier.

The challenge is without merit.

## IV

For the foregoing reasons, we AFFIRM Jones's convictions and sentence.