[Cite as *State v. Ward*, 2012-Ohio-988.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                    CASE NO. 13-11-17

     v.

JOHN E. WARD,                             O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 10 CR 0133

**Judgment Affirmed**

**Date of Decision: March 12, 2012**

APPEARANCES:

    *James S. Nordholt, Jr.* for Appellant

    *Derek W. DeVine and James A. Davey* for Appellee

**SHAW, P.J.**

{¶1} Appellant, John E. Ward ("Ward"), appeals the April 18, 2011 judgment of the Seneca County Court of Common Pleas journalizing his conviction by a jury for two counts of aggravated trafficking in drugs and sentencing him to serve fifteen months in prison on each count, to be served consecutively.

{¶2} On July 29, 2010, the Seneca County Grand Jury returned a two count indictment alleging Ward committed aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(1),(C)(1)(a). Both offenses are felonies of the fourth degree.

{¶3} The charges stemmed from two controlled purchase operations conducted by the Seneca County Drug Task Force MERITCH Enforcement Unit on February 16, 2009, and on March 2, 2009. Each of these controlled purchase operations involved the use of a confidential informant, hereinafter referred to as the "CI," who purchased a prearranged amount of Oxycodone from Ward. During the controlled purchase operations, law enforcement outfitted the CI with an audio transmitter and recorder, which recorded the CI's conversations with Ward during each drug transaction. The CI died unexpectedly after participating in the two controlled purchase operations involving Ward.

{¶4} On October 12, 2010, Ward filed a motion in limine to exclude from evidence any out-of-court statements made by the CI during the operations, in

particular any statements made by the CI identifying Ward as the person who sold him the Oxycodone. Ward argued that because the CI was unavailable to testify at trial, his out-of-court statements are considered hearsay and their admission would violate his Sixth Amendment right of confrontation.

{¶5} The trial court held a hearing on Ward's motion in limine. On January 7, 2011, the trial court issued a Judgment Entry granting in part and overruling in part Ward's motion in limine. Specifically, the trial court excluded evidence of the CI's statements made during a photo array identifying Ward as the suspect. However, the trial court permitted the prosecution to use the audio recordings from the controlled purchase operations, concluding that the recordings are not hearsay and the confrontation clause would not be violated. The trial court also ruled that it would give a limiting instruction regarding the audio recordings to the jury.

{¶6} Ward filed two additional motions in limine requesting the trial court to exclude from evidence any out-of-court statements made by the CI to law enforcement after his encounters with Ward, and any out-of-court statements made by the CI during a subsequent interview with law enforcement. After a hearing, the trial court granted both of these motions in limine. As a result of the trial court's rulings, the prosecution was limited to only introducing the portion of the audio recordings that captured the CI's encounter with Ward during the drug

transactions, and was not permitted to introduce any portion of the tape after the transactions concluded. The recording of the CI's interview with law enforcement was also excluded from being presented as evidence in the prosecution's case-in-chief.

{¶7} The case proceeded to a jury trial on April 11 and 12, 2011. The prosecution presented the testimony of the law enforcement officers involved in each of the controlled purchase operations. In addition, the prosecution also presented the testimony of the forensic scientists who analyzed the drugs the CI purchased from Ward and confirmed its identity as Oxycodone. Ward testified on his own behalf.

{¶8} On April 12, 2011, the jury returned a guilty verdict for both counts of aggravated trafficking in drugs, convicting Ward of both offenses.

{¶9} On April 18, 2011, the trial court sentenced Ward to serve fifteen months in prison for each offense, to be served consecutively.

{¶10} Ward now appeals, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED BY ADMITTING TESTIMONIAL STATEMENTS MADE BY AN UNAVAILABLE WITNESS THROUGH AUDIO TAPES OF ALLEGED DRUG TRANSACTIONS AND THE TESTIMONY OF POLICE OFFICERS.**

## ASSIGNMENT OF ERROR NO. II

**THE VERDICT OF GUILTY RENDERED BY THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶11} For ease of discussion, we elect to address Ward's assignments of error together.

### *First and Second Assignments of Error*

{¶12} On appeal, Ward claims the trial court erred in permitting the prosecution to use the audio recordings of the actual drug transactions during the controlled purchase operations as evidence against him. Ward also challenges the jury verdict, asserting that it is against the manifest weight of the evidence.

{¶13} The following testimony was elicited as evidence at trial. Detective Armstrong, a police officer with the Fostoria Police Department and a detective with the Seneca County Drug Task Force MERTICH Enforcement Unit, testified that he was the case manager assigned to both controlled purchase operations and made all the decisions regarding how the operations proceeded. Detective Armstrong testified that he had previously participated in approximately two hundred controlled purchase operations.

{¶14} On the stand, Detective Armstrong explained the typical protocol used in a controlled purchase operation. As standard "pre-operational protocol," the CI and law enforcement meet at a "pre-determined location," where the CI and

his vehicle are searched by law enforcement for contraband.[1] The CI is outfitted with an audio transmitter and recorder which serves two functions: 1) to transmit in real time to the listener all the sounds captured by the device during the operation; and 2) to digitally record all the sounds captured by the device during the operation. Detective Armstrong explained that during the pre-operational protocol law enforcement also issues the CI money to purchase the illegal drugs anticipated to be obtained in the operation. The serial numbers on the bills are recorded prior to being issued to the CI.

{¶15} Detective Armstrong explained that in both of these instances involving Ward, the CI and law enforcement left the pre-determined location and travelled to the "target location," where the controlled purchase was arranged to take place. In both operations, the target location was the alley behind the CI's home located at 194 East Perry Street in Tiffin, Ohio. Detective Armstrong testified that law enforcement conducted both visual and audio surveillance of the operations. The audio surveillance was conducted with the use of the audio transmitter and recorder placed on the CI, and the visual surveillance was conducted with the use of a video camera.

---

[1] The testimony at trial also revealed in detail the procedure used by law enforcement to conduct the search of the CI and his vehicle. The vehicle search lasts approximately five to ten minutes and is performed in same manner as a typical traffic stop search. Specifically, law enforcement thoroughly searches the vehicle including the glove box, under the seats and mats, and the trunk. During the search of the CI, the CI is asked to remove all outer layers of clothing, including his shoes, so that his first layer of clothing is all that remains on his person. The CI's clothing and shoes are searched by law enforcement and the CI is thoroughly patted down.

{¶16} Detective Armstrong testified that immediately after the completion of each operation, the CI and law enforcement returned to the pre-determined location to conduct the "post-operational protocol." At this time, the CI turns over the illegal drugs he purchased in the operation to law enforcement and the contraband is packaged and labeled as evidence. The CI and his vehicle are again searched for additional contraband, and the audio transmitter and recorder is removed.

*1. February 16, 2009 Controlled Purchase Operation*

{¶17} In this particular instance, Detective Armstrong recalled that the operation was initiated when the CI contacted him about arranging the purchase of seven OxyContin 80 pills from a person named "John."[2] Detective Armstrong testified that based on the information he obtained from the CI, he anticipated that the price would be $50.00 per pill. Detective Armstrong explained that he was the "control officer" for this particular CI, meaning that the CI would contact Detective Armstrong anytime he discovered that he could purchase illegal drugs from someone to see if law enforcement was available to conduct a controlled

---

[2] OxyContin is the trade name for Oxycodone Hydrochloride controlled-release tablets, an opioid analgesic drug. "Oxycodone is a morphine-like drug that is highly addictive and is rated as a Schedule II narcotic, a designation given by the government that identifies a prescription medication as having a great potential for abuse. A Schedule II designation also means that the drug, while accepted for medical use, has severe restrictions, and abuse of the drug has a high potential to lead to severe psychological or physical dependence." *Howland v. Purdue Pharma L.P.*, 104 Ohio St.3d 584, 2004-Ohio-6552, ¶¶ 2-3. Detective Armstrong testified that OxyContin 80 contains 80 milligrams of Oxycodone.

purchase operation. After speaking with the CI, Detective Armstrong authorized the CI to arrange the purchase with the seller.

**{¶18}** Detective Armstrong recalled that the operation occurred in the afternoon. Detective Armstrong and two other detectives, Detectives Joseph and Vallery,[3] met with the CI at the pre-determined location to conduct the pre-operational protocol. Detective Armstrong testified that he searched the CI and fitted him with the audio transmitter and recorder. Detectives Vallery and Joseph both testified that together they searched the CI's vehicle. The testimony of all three Detectives confirmed that no contraband was found either on the CI or in his vehicle. Detective Armstrong testified that he issued the CI $350.00 to purchase the seven OxyContin tablets at $50.00 apiece. Detective Armstrong recalled that he assigned Detective Joseph to conduct the video surveillance of the operation, while he and Detective Vallery monitored the audio surveillance.

**{¶19}** After completing the pre-operational protocol, the CI and the detectives left the pre-determined location and headed toward the target location. The CI drove his own vehicle, with Detective Joseph in one vehicle, and Detectives Vallery and Armstrong riding together in another. Detective Joseph testified that he was the first to leave the predetermined location with the CI behind him, and Detectives Armstrong and Vallery following the CI.

---

[3] Detectives Joseph and Vallery testified that they collectively have over 28 years of law enforcement experience and have conducted over a thousand controlled purchase operations.

{¶20} Detective Armstrong recalled that while en route to the target location, he received information from the CI that the person from whom he was supposed to buy the OxyContin pills had arrived early. Specifically, the CI indicated to the detectives that the suspect was in a blue-green four-door vehicle stopped at the intersection. The same blue-green four-door vehicle then pulled up into the lane next to Detectives Vallery and Armstrong's vehicle. Detective Armstrong testified that from his vantage point he was able to get "a full visual" of the driver, whom he later identified as Ward. Detective Armstrong also observed a handicapped placard hanging from the vehicle's rearview mirror.

{¶21} At this time, Detective Armstrong was also able to observe the license plate on the blue-green vehicle. Detective Armstrong testified that he ran the license plate number through LEADS, a national law enforcement database, and discovered that the vehicle was registered to John E. Ward. The suspect then followed the CI to the target location. Detectives Armstrong and Vallery arrived at the target location shortly after the CI and the suspect.

{¶22} On the stand, Detective Joseph testified that he remembered hearing the call over the police radio indicating that the suspect had arrived early and that his vehicle had been identified as the one stopped at the intersection. Detective Joseph testified that he then observed both the CI's and the suspect's vehicles behind him while en route to the target location. Detective Joseph described the

suspect's vehicle as blue-green in color. Detective Joseph also recalled hearing Detective Armstrong recite the license plate number of the suspect's vehicle over the radio.

{¶23} Once at the target location, Detective Joseph explained that he parked his vehicle in a nearby parking lot where he could observe the location of the anticipated drug transaction. Detective Joseph testified that he arrived at the target location shortly before the CI and suspect, who arrived at the same time. As a consequence of the suspect arriving early, Detective Joseph was only able to record the tail-end of the drug transaction with the video recorder, which depicted the blue-green car identified as the suspect's leaving after the illegal drug purchase took place. However, Detective Joseph testified that while he was trying to focus the video camera he personally observed the CI speaking to a white male during the time the drug transaction occurred.

{¶24} Detective Armstrong testified that he audibly monitored in real time the conversation between the CI and Ward during this operation. At trial, Detective Armstrong identified the voices on the audio recordings as those belonging to the CI and Ward. Detective Armstrong explained that he was familiar with the CI's voice because he was the "control officer" for the CI and had daily contact with him. Detective Armstrong further explained that his familiarity with Ward's voice stemmed from his participation in the controlled

purchase operations and other additional occasions on which he interacted with Ward after the conclusion of the operations.

{¶25} The following is an excerpt from the audio recording of the February 16, 2009 controlled purchase operation, which was played for the jury.

**JW:** **(Inaudible.)**

**CI:** **I know. We'll I am trying to make you some money, man. There is one, two—seven there?**

**JW:** **I can't give you my bottle.**

**CI:** **All right. Wait a minute.**

**JW:** **(Inaudible) give you my bottle.**

**CI:** **One, two—you can count it. There's $350; one, two, three, four, five—All right. All right. Well, I'll get ahold of you later, all right?**

**JW:** **(Inaudible) three or four more but they're 50, man, and I'd have to pull a couple strings to get 'em because I gotta go to Upper.**

**CI:** **All right. Well, I'll just give you a call later, all right? Just give me a call. I'll give you a call in a couple hours or something, an hour. When are you going up there?**

**JW:** **I'm gonna be leaving (Inaudible).**

**CI:** **Well, call me when you get back then.**

**JW:** **I gotta go pay bills and shit, you know what I mean?**

**CI:** **Yeah. Well, call me when you get back. Yeah. Uhm, yeah I got—Yeah, I gotta go drop these off real quick.**

(Trans. p. 221-22).

{¶26} At trial, Detective Armstrong testified to his own perceptions of the conversation between the CI and Ward on the audio recording of the February 16, 2009 transaction. Detective Armstrong explained that he heard Ward state he could not give the CI his bottle. Based on his experience, Detective Armstrong testified that Ward was referring to a prescription pill bottle, which was sometimes used as the vessel to hold the illegal drugs sold in a controlled purchase operation.

{¶27} On the stand, Detective Armstrong also explained the significance of Ward's statements "three or four more but they're 50, man, and I'd have to pull a couple strings to get 'em because I gotta go to Upper." Detective Armstrong testified that based on his experience, the CI and Ward were arranging another purchase of illegal drugs for three or four more pills at $50.00 a piece, but that Ward would have to travel to Upper Sandusky, a neighboring town, to obtain the drugs. Detective Armstrong explained that he also heard the CI counting to 350 which he believed indicated that the CI had completed the purchase of the seven OxyContin pills for $50.00 each.

{¶28} Detectives Armstrong, Joseph, and Vallery each testified that they followed the CI to the pre-determined location after the operation was complete to conduct the post-operational protocol. Detective Vallery recalled that he searched both the CI and his vehicle after the operation. Notably, the $350.00 in marked

bills given to the CI prior to the operation was not found. At this time, the CI handed Detective Vallery the illegal drugs obtained during the operation, which were identified as the anticipated seven OxyContin pills.

{¶29} Detective Vallery described the contraband as pills loosely contained in a cellophane wrapper, similar to the kind found on the outer wrapping of a cigarette pack. The fact that the anticipated contraband was contained in the cellophane wrapper directly correlates with Detective Armstrong's perceptions of Ward's statements on the audio recordings indicating that he could not give the CI his prescription pill bottle to transport the illegal drugs. Notably, as highlighted in our discussion of the second controlled purchase operation; the illegal drugs exchanged in that transaction were contained in a prescription pill bottle with the label removed.

{¶30} Detective Vallery testified that he then handed the contraband to Detective Armstrong. Detective Armstrong testified that he packaged the pills and labeled them as evidence. The testimony at trial revealed that at this time no other contraband was found on either the CI or in his vehicle. Detective Armstrong also confirmed that the audio transmitter and recorder was removed from the CI.

{¶31} The prosecution admitted the pills obtained during the February 16, 2009 operation as an exhibit at trial. On the stand, both Detectives Vallery and Armstrong individually identified the exhibit as the pills purchased by the CI

during the operation. In addition, the prosecution presented the testimony of the forensic scientist who analyzed the identity and the weight of the pills and confirmed that the pills were the scheduled II substance, Oxycodone. The lab report prepared by the forensic scientist was also admitted as an exhibit at trial.

2. *March 2, 2009 Controlled Purchase Operation*

{¶32} Detective Armstrong testified that he learned from the CI that twenty Percocet pills[4] could be purchased from the same seller for $5.00 apiece, or $100.00, and gave the CI permission to arrange the purchase.

{¶33} Detective Armstrong recalled that the operation took place during the afternoon of March 2, 2009. This time, the participating law enforcement officers were Detectives Armstrong, Joseph and Boyer.[5] The detectives met the CI at the pre-determined location to conduct the pre-operational protocol. Detective Joseph testified that the CI was searched and the audio transmitter and recorder was placed on the CI's body. The CI's vehicle was not involved in this operation. Detective Armstrong testified that the CI was issued five marked $20.00 bills.

{¶34} The target location during this operation was the same as in the previous operation. Detective Boyer was assigned to conduct the video surveillance.

---

[4] Percocet is composed of Oxycodone and Tylenol. As previously mentioned, Oxycodone is a schedule II substance.

[5] Detective Boyer testified that he has nineteen years' of experience as a City of Tiffin Police Officer and that he also serves as the unit coordinator for the Seneca County Drug Task Force METRICH Enforcement Unit. He testified that he has participated in over a thousand controlled purchase operations.

**{¶35}** Detective Boyer testified that he parked at the target location, hid in the back of his vehicle, and waited for the suspect to arrive. Detective Boyer's video recording of the operation was admitted as evidence at trial. The recording initially focuses on the CI who is waiting to meet with the suspect. After a few minutes pass, a blue-green four-door vehicle is seen driving down the alley past Detective Boyer's location. There is a handicapped placard hanging from the rearview mirror of the vehicle. Detective Boyer focuses on the driver, who is the sole occupant of the vehicle, and is able to view his face. The vehicle stops at the target location and a man in a brown coat is seen approaching the driver's side of the vehicle. The man in the brown coat then leans into the driver's side window with his hands inside the vehicle for close to a minute. Detective Boyer focuses on the vehicle's license plate and calls in the license plate number over the police radio. The man in the brown coat then leans back from the vehicle and is seen with a small object in his right hand. The man in the brown coat and the driver continue to talk for another minute and then driver leaves the target location.

**{¶36}** At trial, Detective Boyer testified to his observations during the operation and explains the video. Specifically, he identifies the CI as the man wearing the brown coat, who leans into the vehicle. Detective Boyer explained that based on his experience a person typically leans into a vehicle in that manner, in broad daylight, to avoid anyone seeing what is being exchanged. Detective

Boyer testified that it is his understanding that the illegal drugs were exchanged between the suspect and the CI at this moment. Detective Boyer also identified his voice on the video and explained that he recited over the radio the license plate number of the suspect's vehicle to inform the other detectives.

{¶37} Detective Boyer testified that he made still photographs of the driver and the vehicle from his video surveillance. These photographs were also admitted as exhibits at trial. On the stand, Detective Boyer described the images in the photos. The majority of the photos focus on the driver of the vehicle, in particular the driver's face. Detective Boyer identified Ward in the courtroom as the driver of the vehicle in the photos. Another photo depicts the blue-green vehicle with a clear view of the license plate number. Boyer identified this vehicle as the one he observed at the March 2, 2009 controlled purchase operation. The testimony at trial also revealed that the license plate number on the vehicle was the same one observed by Detective Armstrong in the first operation.

{¶38} Detectives Armstrong and Joseph conducted the audio surveillance from the same vehicle. During this time, Detective Armstrong audibly monitored the operation in real time. The operation was simultaneously being recorded. The following is an excerpt of the audio recording of the March 2, 2009 operation, which was also played for the jury at trial.

**CI: What's up, big dawg? Can you roll that down farther or—**

**JW:** (Inaudible).

**CI:** One, two, three, four, five; one hundred. Where are you going? Upper Sandusky? What do you gotta go up there for? (Inaudible) stand right there.

**JW:** I took my kids up there (Inaudible) snow storm. We were upset (Inaudible) thought it was give [sic], then I found out it was (Inaudible.)

**CI:** (Inaudible)

**JW:** I gotta be up there a [sic] six.

**CI:** Well, what time are you gonna be back?

**JW:** Probably about seven, 7:30.

**CI:** Seven, 7:30?

**JW:** Hey, tomorrow might be able to get some Donnes in the morning (Inaudible) fuckin' Blue's old lady to the doctor in the morning.

**CI:** Blue's old lady?

**JW:** Yeah (Inaudible) fuckin' Donnes and Zannies in the morning.

**CI:** That'd be cool. Get a hold of me, man, for sure. Call me tonight.

**JW:** I will.

**CI:** All right.

**JW:** I don't even hardly have any of these left, fuck.

**CI:** Damn, you done got rid of all of them already?

JW: I wanted to fuck—I need a few to fuckin'—I don't know. I wanna get this quarter of red bud that's really (Inaudible) you know?

CI: Yeah.

JW: But I gave [sic] him a few of these, I get a, fuck, quarter of it.

CI: All right.

JW: I was trying to fuckin' (Inaudible) 15, I'd give them five of them.

CI: Yeah.

JW: They told me it'd be ready Monday.

CI: Huh? All right. Well, get a hold of me, man.

JW: I already had some one time, that's fuckin' good, man, fuckin' real good. It's all real red.

CI: Oh, yeah?

JW: You know, like the red hairs in the leaves.

CI: That real—

JW: (Inaudible) green in it.

CI: That real good shit?

JW: Ain't any green in it.

CI: Oh, yeah. Really? I'd like to see some of that.

JW: It's the fuckin' bomb.

> **CI:  Oh yeah.  Okay.  Well, call me when you get back from Upper.**
>
> **JW:  I will.**
>
> **CI:  All right, man.  I'll close our garage . . .**

(Trans. p. 243-46).

**{¶39}** After the audio recording of the March 2, 2009 operation was played, the prosecutor asked Detective Armstrong to explain some of the references made by Ward in his statements.  Detective Armstrong explained that the anticipated goal of this operation was to purchase twenty Percocet pills for $100.00.  Detective Armstrong testified that based on his training and experience he believed that Ward's comments stating that he only had "a few of these" left, that "it'd be ready Monday," and that he wanted to get rid of "15" and "I'd give them five of them" so that he could get "a quarter of a red bud" meant that Ward wanted to keep five of the twenty Percocet pills he arranged to sell to the CI to exchange them for a quarter ounce of marijuana.  However, the CI had already indicated that he wanted to buy the twenty pills.  Detective Armstrong testified that based on his understanding of what had occurred, the CI was able to purchase all twenty pills because he heard the CI counting "one, two, three, four, five; one hundred" indicating that the CI was individually counting the five twenty dollar bills previously issued to him by law enforcement.

{¶40} Shortly after the CI's statements, a noticeable rattling sound was also picked up by the recording. Detective Armstrong described this sound as pills dropping into a prescription pill bottle. After the operation was complete, the twenty Percocet pills purchased by the CI were turned over to the detectives. Notably, the pills were contained in a prescription pill bottle with the label removed, which was consistent with Detective Armstrong's perceptions while listening to the recordings. Detective Armstrong also explained Ward's references to "Zannies" and "Donnes" as the street names for Xanax pills and Methadone pills.[6]

{¶41} Detective Armstrong testified that after the operation he and Detective Joseph picked-up the CI from the target location and drove him to the pre-determined location to conduct the post-operational protocol. At this time, the CI handed Detective Joseph the twenty pills contained in the plastic prescription pill bottle with the label removed. Detective Joseph testified that he received the pills from the CI, and then labeled and packaged the pills as evidence. Detective Armstrong confirmed that the CI was searched and the audio transmitter and recorder was removed. Detective Armstrong testified that neither the marked bills nor any additional contraband were found on the CI's person.

---

[6] Xanax is an anti-anxiety drug and a schedule IV substance. Methadone is a pain reliever and a schedule II substance.

{¶42} At trial, the prosecution admitted as an exhibit the package of evidence containing the pills purchased by the CI in the operation. On the stand, Detective Joseph identified the pills as the ones obtained in the March 2, 2009 operation. In addition, the prosecution presented the testimony of the forensic scientist who analyzed the identity and the weight of the pills and confirmed that the pills were the scheduled II substance, Oxycodone. The lab report prepared by the forensic scientist was also admitted as an exhibit at trial.

{¶43} In his first assignment of error, Ward argues that the trial court erred in partially overruling his motion in limine to exclude as evidence against him the audio recordings of the controlled purchase operations. Specifically, Ward argues that the statements of the CI captured by the recordings constitute hearsay and violate his Sixth Amendment right of confrontation.

{¶44} As an initial matter we note that decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *State v. Yohey* (March 18, 1996), 3d Dist. No. 9-95-46, citing *State v. Graham*, 58 Ohio St.2d 350 (1979), and *State v. Lundy*, 41 Ohio App.3d 163 (1987). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, (1983).

**{¶45}** We have previously addressed this issue and concluded that the audio recordings of actual drug transactions are not hearsay, and that the introduction of such recordings does not violate the confrontation clause. *See State v. Perkins*, 3d Dist. No. 13-10-36, 2011-Ohio-2705, ¶ 5; *State v. Stewart*, 3d Dist. No. 13-08-18, 2009-Ohio-3411, ¶ 90. The rationale underpinning our prior cases is based on state and federal authority which has uniformly held that the introduction of a CI's statements recorded during the actual drug transaction with the defendant are not offered to prove the truth of the matter asserted, but are merely necessary to establish the context of the defendant's own statements and responses captured on the recordings. *Stewart* at ¶ 90 citing *State v. Sloan*, 8th Dist. No. 79832, 2002-Ohio-2669, ¶ 16; *State v. Hill*, 5th Dist. No. CA-8094 (Dec. 31, 1990). *See, also United States v. Price*, 792 F.2d 994, 996 (11th Cir.1986) (finding that the statements of the deceased CI on the audio recordings of a narcotics transaction involving the defendant were not hearsay and did not violate the defendant's Sixth Amendment right of confrontation because "[t]he single purpose for admitting the [CI's] statements was to make understandable to the jury the statements made by [the defendant] himself.") Notably, Ohio appellate courts, as well as other jurisdictions, have ruled on this issue consistent with our prior opinions. *See e.g.*, *State v. Jones*, 4th Dist. No. 09CA1, 2010-Ohio-865, ¶ 24; *State v. Aldrich*, 12th Dist. No. CA2006-10-044; 2008-Ohio-1362, ¶ 9; *United*

*States v. Jones*, 205 Fed. Appx. 327, 342 (C.A.6 2006); *Turner v. Kentucky*, 248 S.W.3d 543, 545-546 (Ky.2008); *Connecticut v. Smith* (CT 2008), 289 Conn. 598, 960 A.2d 993, 1011-1012.

{¶46} In this instance, the trial court also gave the jury the following instruction regarding the evidentiary weight to be allotted to these audio recordings.

> **Now, in this case, the Court has permitted the State of Ohio to introduce the statements of the confidential informant made outside of court through the introduction of various audio recordings over the objection of John Ward. These statements have not been introduced for the truth of the matter asserted. Rather, these statements have been allowed into evidence to merely establish the context of the suspect's statements and responses. For that reason, you, the jury, may not consider the statements of the confidential informant for the truth of the matter asserted.**

(Trans. p. 321).

{¶47} Based on the testimony which we set forth above, we believe that the audio recordings of the controlled purchase operations were introduced for the permissible purpose of establishing the context of Ward's statements consistent with the ruling of our prior case law. We also believe the record demonstrates that the audio recordings were offered for an additional purpose to provide the context for the personal observations and perceptions made by Detective Armstrong while he audibly monitored the drug transactions in real time, and to assist Detective Armstrong in providing testimony to that effect on the stand. Therefore, we

conclude that the audio recordings of the operations do not constitute hearsay and their admission did not violate Ward's Sixth Amendment right to confrontation. Ward's first assignment of error is overruled.

**{¶48}** In his second assignment of error, Ward challenges the jury verdict convicting him on two counts of aggravated trafficking in drugs. Specifically, Ward argues that the jury verdict was against the manifest weight of the evidence.

**{¶49}** An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id*. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1–05–70, 2006–Ohio–3764, ¶ 30, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *Thompkins*, 78 Ohio St.3d at 387.

**{¶50}** Ward was convicted of aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(1),(C)(1)(a), which provides:

**(A)  No person shall knowingly do any of the following:**

**(1)  Sell or offer to sell a controlled substance;**

**(C)  Whoever violates division (A) of this section is guilty of one of the following:**

**(1)  If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II. * * * The penalty for the offense shall be determined as follows:**

**(a)  * * * aggravated trafficking in drugs is a felony of the fourth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.**

{¶51} On appeal, Ward contends that the jury verdict was against the manifest weight of the evidence because the only witness who could identify Ward as the person who sold the Oxycodone in the controlled purchase operations is now deceased and unable to testify in court. Therefore, Ward challenges the validity of the jury verdict, asserting that there was no direct evidence introduced at trial to either identify him as the person who sold the Oxycodone to the CI or to demonstrate that an illegal drug transaction actually occurred.

{¶52} Despite Ward's contentions, direct and circumstantial evidence do not differ in terms of their probative value. *State v. Treesh*, 90 Ohio St.3d 460, 485, (2001), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991) paragraph one of the syllabus. It is well established that "circumstantial evidence is sufficient to sustain a conviction if the evidence would convince the average mind of the defendant's

guilt beyond a reasonable doubt." *State v. McKnight*, 107 Ohio St.3d 101, 2005–Ohio–6046, ¶ 75. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *State v. Lott*, 51 Ohio St.3d, 160, 168 (1990), quoting *Michalic v. Cleveland Tankers, Inc*, 364 U.S. 325, 330 (1960).

**{¶53}** As observed by the United States Supreme Court, "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it," because "[t]he sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States* (1987), 483 U.S. 171, 179–180. In addition, "a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." *Id*. at 180. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott*, 51 Ohio St.3d at 168, citing *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St., 329, 331 (1955).

**{¶54}** In reviewing the testimony presented at trial, we find there is substantial circumstantial evidence identifying Ward as the person who sold the Oxycodone to the CI during both controlled purchase operations. Detectives Boyer and Armstrong each identified Ward as the person they observed meeting with the CI during the operations. Moreover, they each identified Ward's vehicle as the one involved in the operations.

{¶55} In addition, Detective Armstrong also explained that when he ran the license plate number of the vehicle through the database every picture Ward had taken over the years to renew his driver's license identification card appeared on the screen. Detective Armstrong testified that upon seeing those pictures he was able to identify Ward as the person he had seen in the vehicle with the CI at the target location.

{¶56} Detective Armstrong also testified that he had seen Ward on a few occasions in addition to the two controlled purchase operations. Detective Armstrong recalled a specific instance where he had an hour-long conversation with Ward at a child custody hearing, which was prompted as a result of the charges pending in this case. Detective Armstrong remembered talking with Ward in a doorway waiting to go into the courtroom. Detective Armstrong also recalled participating in at least two traffic stops involving Ward, which occurred after the controlled purchase operations were completed.

{¶57} Detective Armstrong further testified that Ward has a distinguishing physical characteristic which assisted him in identifying Ward. Detective Armstrong explained that based on his personal observations of Ward, he noticed that Ward walks with a limp. At trial, Ward testified that in 1999 he became disabled with a fused leg and a bad back. All of this testimony further bolstered

Detective Armstrong's identification of Ward as the person who sold the Oxycodone to the CI in the controlled purchase operations.

{¶58} Ward challenges the prosecution's evidence identifying him as the seller in the controlled purchase operations based on the fact that law enforcement did not attempt to analyze any fingerprints potentially found on the containers in which the Oxycodone was transferred, or to conduct a voice analysis of the audio recordings. On cross-examination, Ward's counsel asked each of the detectives who participated in the controlled purchase operations why neither a fingerprint nor a voice analysis were performed in this case. The detectives provided similar and consistent responses to this question stating that it is not standard protocol to perform these types of tests, specifically when they believed the identity of the suspect is not in question. Moreover, the testimony revealed that fingerprint analysis is usually futile in these types of cases because it is difficult to lift a fingerprint off of cellophane or a plastic prescription pill bottle. Ward's counsel also asked the detectives why Ward was not arrested immediately after the operation. The detectives explained again that it was not protocol to arrest the suspect immediately after a controlled purchase operation because at that time the CI's identity would be revealed, and the CI would no longer be of use to law enforcement in the future.

{¶59} At trial, Ward testified on his own behalf. Ward denied selling the drugs to the CI on February 16, 2009 and on March 2, 2009. Ward admitted that during the time of the controlled purchase operations he had owned a vehicle which matched the description of the one identified by the detectives. However, Ward claimed that during these pertinent time periods he had entrusted his vehicle to a local mechanic and therefore he was not in possession of the vehicle at all times relevant to the operations. Ward also testified that he has been unable to maintain employment since 2006 due to his disability. Ward further testified that in the past he had been prescribed Percocet, Oxycontin 10, 20, 30, 40 and 80, but insisted that he never failed a pill count.[7]

{¶60} There is also ample circumstantial evidence demonstrating that a drug transaction occurred in each instance that the CI met with Ward during the controlled purchase operations. As previously discussed, each of the detectives involved in the controlled purchase operations testified to the procedural protocol conducted during the operations. Moreover, each of the detectives testified to his specific role in that protocol. On both occasions, the CI and his vehicle, if it was involved, were extensively searched before and after the operation. Prior to each operation, the CI was issued marked bills to complete the purchase, which were

---

[7] Based on the testimony at trial, the number after OxyContin indicates the milligram amount of Oxycondone. For example, OxyContin 10 means that the drug contains 10 milligrams of Oxycodone. In addition, Ward testified that a "pill count" is a random screening ordered by a doctor which involves a patient going into a pharmacy to count the pills to ensure that the patient has the appropriate amount of pills remaining at that point in the prescription period.

not found on his person or in his vehicle after meeting with Ward. In both instances, it was only after the CI met with Ward, that the CI had obtained the anticipated amount and type of drugs expected to be purchased in the operation.

{¶61} In addition, the audio recordings of the encounters between Ward and the CI provide evidence that drug transactions had occurred. In each of the recordings, the CI is heard counting the precise amount of money anticipated to be used in the transaction. As explained by Detective Armstrong, Ward's own statements on the audio recording of the two operations indicate that a drug transaction was in progress. Each of these facts and circumstances together created a reasonable basis for the jury to conclude that Ward was the person who sold the Oxycodone to the CI during the operations and that an actual illegal drug purchase occurred on each of these occasions.

{¶62} In the end, it was solely within the province of the jury to weigh the evidence and consider the credibility the witnesses to determine whether the evidence sustained a conviction. In this case, it is apparent that the jury found the evidence to be adequate to support finding Ward guilty on two counts of aggravated trafficking in drugs.

{¶63} After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we conclude that a reasonable jury could have found that Ward was the person who sold Oxycodone

to the CI during the controlled purchase operations on February 16, 2009 and on March 2, 2009, and that an actual drug transaction occurred during the operations. Therefore, we further conclude that the jury did not lose its way and create a manifest miscarriage of justice in reaching these conclusions. Accordingly, we find that Ward's convictions for aggravated trafficking in drugs are not against the manifest weight of the evidence. Ward's second assignment of error is overruled.

{¶64} For all these reasons, the judgment is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**